## Appeal of Elizabeth E. Miskey et al.

1. The finding by a jury of inquest in lunacy or habitual drunkenness proceedings is only prima facie evidence and may be rebutted by other testimony. This is so whether the inquisition be negative or affirmative.

2. The absence of a power of revocation in a voluntary deed is a circumstance which throws the burden of proof upon the party deriving the benefit, and in the absence of proof of a distinct intention to make the gift irrevocable the conveyance will be set aside, if the other circumstances of the case require it.

3. A transaction between persons in a confidential relation is regarded

107 611
110 364
121 319
107 611
134 126
107 611
135 120
107 611
145 636
107 611
150 268
107 611
163 294
107 611
170 217
107 611
174 337
107 611
177 105
107 611
190 344
107 611
193 611
107 611
210 ³243

612 SUPREME COURT [*Philadelphia*

107 611
200 574
107 611
212 *237
212 516
107 611
d 32 SC ³650

with jealousy and solicitude, and if there be found any trace of undue influence or unfair advantage, redress will be given to the injured party. In the case of a voluntary deed from a son to his father, who is a beneficiary under it, the burden of proof is upon the latter to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscionable.

4. A man of intemperate habits, by which he had become enfeebled in mind and body, made a voluntary conveyance of all his estate to his father, in trust for his (the grantor's) father, mother and sister. The deed made no provision for the grantor's wife and but an inadequate provision was made for the only son. The parties benefiting by the deed were in affluent circumstances and the consideration expressed in it was but nominal. The deed contained no power of revocation and there was no proof that the grantor was conscious of that fact or that his attention was called to it. The transaction was under the professional advice of the father's attorney, and the son's private attorney was not cognizant of the proceedings.

*Held*, in a suit in equity brought by the widow and administratrix of the grantor, to set aside the deed, that the deed should be set aside in favor of the grantor's widow, and the property be transferred to her as the administratrix of her husband's estate.

March 19th, 1883.* Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ. CLARK, J., absent.

APPEAL from the court of Common Pleas No. 1, of *Philadelphia county:* In Equity: Of January Term, 1883, No. 159.

Appeal of Elizabeth E. Miskey, Edward H. Hance and Charles W. Otto, executors of Anthony Miskey, deceased; Elizabeth E. Miskey, Edward H. Hance and Charlotte E. Hance, his wife, from the decree of the said Court, declaring a certain voluntary deed to be fraudulent, and directing that it be delivered up to be cancelled, &c.

This was a bill in equity filed by Maria E. Miskey, administratrix of the estate of Jacob A. Miskey, deceased, against the above named appellants, together with Clarence A. Miskey, a minor child of Jacob A. Miskey, the Pennsylvania Railroad Company, and several other corporations, to set aside a certain deed of trust made by Jacob A. Miskey whereby he assigned to his father, Anthony Miskey, certain specified shares of stock in the corporations defendant, and all other the estate of the said Jacob A. Miskey, on certain trusts. The bill charged substantially that the plaintiff was the widow and administratrix of Jacob A. Miskey, who died on December 16th, 1875; that she was married to him on October 6th, 1856; that Jacob A. Miskey had been for many years of very intemperate habits; that she accordingly had commenced pro-

* This case appears out of its chronological order, from the fact that it was only recently ordered to be reported.—REP.

ceedings in habitual drunkenness against him, which resulted in the filing of an inquisition on July 2d, 1875, which the plaintiff traversed. That at the time of his death Jacob A. Miskey was possessed of upwards of $70,000 invested in certain stocks mentioned in the bill. That because of his intemperate habits the plaintiff was compelled to leave her husband on August 14th, 1874.

That on June 26th, 1875, Jacob A. Miskey executed a deed of trust of his property, including his stocks, to his father, Anthony Miskey, *in trust*, to permit Jacob A. Miskey to receive the dividends, &c.; and at his discretion to sell and invest the same; the dividends, &c. only to be received by him during his life, and at his death to pay Clarence A. Miskey, his son, $10,000 out of the sale of said securities, and the balance of his estate to divide equally between said Anthony Miskey, Elizabeth E. Miskey, his mother, and Charlotte E. Hance, his sister, and in case either should die before him, then the share of the deceased to go to and vest in the survivors; and on the request of Jacob A. Miskey, in writing, Anthony Miskey consenting in writing, Anthony Miskey was authorized to transfer to Jacob A. Miskey, such of the securities as it might be expedient in any emergency or other sufficient cause to hand over to him, for his own individual benefit, without accounting to the trust.

The complainant further charged that said deed of trust was contrived by said Anthony Miskey, Elizabeth E. Miskey and Charlotte E. Hance to defraud the plaintiff; that the same was procured by fraud and undue influence, and while said Jacob A. Miskey was enfeebled by disease, and while his mind was impaired from his intemperate habits, and that it should be declared void for inadequacy of consideration.

The bill prayed (1) for an injunction restraining the several corporations from allowing a transfer of any stock standing in the name of Jacob A. Miskey. (2) That the deed of trust might be declared fraudulent and delivered up for cancellation. (3) That the several corporations might be required to allow the plaintiff to transfer said stocks, and receive the dividends thereof. (4) Further relief.

The answer denied all the allegations in the bill to the effect that Jacob A. Miskey had been for many years a man of intemperate habits; or that his health and mental faculties had become impaired by intemperance, and on the contrary they averred that his mental faculties were not impaired at any time prior to his death. The defendants admitted the proceedings in habitual drunkenness against Jacob A. Miskey, and averred that the inquisition found that he was not an habitual drunkard. They averred that in March, 1865, when

the plaintiff left her husband the first time, he was compelled
to give her shares of stock to the value of $14,000, in order
to procure her return to her home and duty.   They expressly
denied all charges of any habit incapacitating Jacob A. Mis-
key from transacting business, or from executing said deed of
trust; they denied all the charges of art, contrivance, fraud,
combination or endeavors to possess themselves of Jacob A.
Miskey's property and the exertions of any influence.   They
denied that he was enfeebled by disease or that his mind was
impaired from any cause at the time of the execution of said
deed, and averred that he was perfectly competent to execute
said deed, and that he executed it of his own free will and
accord, and that he was not under the control of Anthony
Miskey, but that he had the counsel and advice of an upright
member of the bar (Wm. L. Hirst, Esq.), who prepared the
deed by the order of Jacob A. Miskey; that there was a good
consideration for the execution of said deed, and that he exe-
cuted and delivered it without fraud, deception, contrivance,
importunity, undue influence, or any other cause or thing
affecting said deed.   That the defendants, Elizabeth Miskey
and Charlotte E. Hance were unaware of the existence of
said deed until a long time after its execution.

The deed of trust referred to was as follows:

·This indenture made the twenty-sixth day of June, Anno
Domini one thousand eight hundred and seventy-five, between
Jacob A. Miskey of the city of Philadelphia of the first part,
and Anthony Miskey of the same place of the second part,
witnesseth, that the said Jacob A. Miskey for and in consider-
ation of the sum of five dollars to him in hand paid by the
said Anthony Miskey at and before the ensealing and delivery
hereof, the receipt whereof is hereby acknowledged, hath
granted, bargained, sold, assigned, transferred and set over,
released and confirmed, and by these presents doth grant,
bargain, sell, assign, transfer and set over unto the said An-
thony Miskey, his heirs, executors, administrators and assigns,
and to him and them doth hereby release and confirm all and
singular, all the estate and property of him, the said Jacob A.
Miskey, whatsoever and wheresoever, including the capital
stock certificates of the Pennsylvania Railroad Company, the
Reading Railroad Company, the Lehigh Valley Railroad Com-
pany and all other companies, and all public loans to which he
is in any manner entitled in law or equity and every part
thereof.   To have and to hold the estate and property hereby
granted, assigned, transferred, sold, released and confirmed or
intended so to be, and every part thereof, and all dividends,
interest or income accrued or to accrue thereon to the said
Anthony Miskey, his heirs, executors, administrators and as-

signs forever. *In trust*, however, that he, the said Anthony
                    *permit the said Jacob to*
Miskey shall receive the dividends, income and interest
                                        ∧
thereon, and at his discretion sell and re-invest the same and
any part thereof, and pay the dividends, interest and income
*shall be only received by*
thereof to the said Jacob A. Miskey for and during the term
                    ∧
of his natural life, and from and after the death of the said
Jacob A. Miskey then in trust to pay to Clarence A. Miskey,
his son, the sum of ten thousand dollars out of the sale of
said securities, either the whole or any part thereof, in the dis-
cretion of the said Anthony Miskey as he shall think it best
for the interests of the said Clarence, and until such payment
or payments to pay to the said Clarence interest at six per
cent. on said sum of ten thousand dollars or so much thereof
as he shall not have paid out of the principal sum, and as to
the rest and residue of all said estate and property *In trust* to
pay, assign, transfer and divide the same equally and share
and share alike to and among the father of the said Jacob A.
Miskey, to wit: the said Anthony Miskey, Elizabeth E.
Miskey, the mother of the said Jacob A. Miskey, and Char-
lotte E. Hance, the sister of the said Jacob A. Miskey, and in
case either of said three persons shall die before the said
Jacob A. Miskey then the share or shares of said deceased
persons shall go to and absolutely vest in the survivor or sur-
·vivors. And it is expressly provided that on the request of
the said Jacob A. Miskey in writing, consented to in writing
by the said Anthony Miskey, he, the said Anthony, is hereby
fully authorized to transfer to the said Jacob A. Miskey such
of said securities as it may be expedient in case of any emer-
gency or other sufficient cause to hand over to him for his own
individual use, without accounting to the trust hereby created.

In witness whereof the said parties have hereunto set their
hands and seals, the day and year first above written.

                    JACOB A. MISKEY. [SEAL.]

Sealed and delivered in }
the presence of us:        }

The words "*permit the said Jacob*}
*to receive*" being first interlined above|
10th line, the word "pay" erased|
15th line, and the words "*shall be*}
*only received by*" written on next line|
3d page, and "*Elizabeth*" written 3d|
page 4th line.                            }

          W. L. HIRST,
          JAMES FITZPATRICK.

I hereby accept the above trust, this twenty-sixth June,
1875.                    ANTHONY MISKEY. [SEAL.]

The case was referred to George Junkin, Esq., as Examiner and Master, who took voluminous testimony occupying 1109 printed pages. Those portions on which the court chiefly relied will be found cited in the opinion of this court. The Master in a lengthy report found as a fact that at the time of the execution of the deed Jacob A. Miskey was an habitual drunkard and had been so several years previously thereto; that his continuous course of dissipation had affected his mind, which was not originally a very strong one, that Mrs. Anthony Miskey and Mrs. Hance, her daughter, were not on good terms with Maria E. Miskey, Jacob's wife, whose husband's affection for her always continued, and that the deed in controversy was not the intelligent act of Jacob A. Miskey when in the fair possession of his faculties, and was procured by undue parental influence. The Master accordingly reported a decree as prayed for by the bill.

Numerous exceptions filed by the respondents to the Master's findings of fact and law were dismissed by the court, PEIRCE, J., filing the following opinion:—

This is a case of the conveyance by a son to his father of all his estate, amounting to about $70,000, of stock, in trust, to permit his son to receive the income of this estate during his life, and after the death of the son, then in trust, to pay $10,000, at such time as the grantee might see proper, to the son of the grantor. The remainder of the estate, about $60,000 in value, was then to be divided between the father, mother and sister of the grantor. There was no provision made by the deed for the wife of the grantor, either during the lifetime of the grantor or after his death.

The circumstances under which this grant was made were somewhat peculiar. The habits of the grantor, to speak mildly, were irregular. He was at times certainly very intemperate. Whilst it was shown that he had ordinary capacity to transact business, yet there was such apprehension even on the part of the father (grantee in trust), that he dissolved his partnership with his son, and placed a watch over him. In the meanwhile, his wife had taken proceedings to have him declared an habitual drunkard, which proceeding, from some cause or other, failed. The Master, however, finds, and so pronounces, that he was an habitual drunkard. The time of the grant was at a moment when it is possible that he would be subject to influence, and particularly as against his wife. His relations to his wife, however, had generally been of a very pleasant character. There is no evidence showing what were the peculiar circumstances that influenced him at the particular moment of the grant; and no evidence respecting

the transaction, except the production of the deed of trust, and the several witnesses to its execution by the grantor.

In cases of this character the courts have looked with watchful interest at such conveyances, especially where the beneficiary to the conveyance holds relations of trust or confidence with the grantor. This case was that of a father and son. The rule of law upon the subject appears to be that where there are such relations, or where there are circumstances to induce the possibility of the exercise of undue influence over the grantor, that the burden of proof rests upon the parties who were benefited by the transaction. They must show not only that the grantor knew precisely what he was about, and that he intended to do what he has done, with the full knowledge of his surroundings and circumstances, but that the disposition and intention and exercise of the act of doing were not produced through their influence.

The Master has gone over this case with great care and precision, and with very great diligence. He has examined all the facts, and his conclusions are set forth in his report. Having also made a complete examination of the law touching such cases, he has come to the conclusion that this grant ought to be set aside. After an examination of his report, and the very full and able argument which was had in this court for two or three days, we come to the same conclusion.

We therefore dismiss the exceptions, affirm the report of the Master, and order that the costs be paid by the defendants, according to the decree reported by the Master.

The court therefore entered a decree that the deed of trust was fraudulent and void, and that it be delivered up by the respondent executors of Anthony Miskey, deceased, to the complainant, to be cancelled, and that the property conveyed by it be transferred to her. Whereupon the respondents took this appeal, assigning for error this decree of the court below, and the action of said court in dismissing the exceptions filed to the Master's report, and in not dismissing the complainant's bill with costs.

*Francis E. Brewster* and *William A. Porter* (with whom was *F. Carroll Brewster*, for the appellants.—The deed of trust was the act of Jacob A. Miskey, while in full possession of his mental faculties, and *at the time* of its execution he was free from the control of any undue influence. His habits, temperate or intemperate, except so far as they produced mental incapacity, do not enter into the inquiry. The onus was on the plaintiff to prove the facts alleged in her bill. The finding, a few days before the execution of the deed, of the jury in the habitual drunkard proceedings, that Jacob A. Mis-

key was not an habitual drunkard is binding and conclusive against the parties until set aside: 1 Greenleaf on Evid. § 556; Stokes *v.* Dawes, 4 Mason 268; Sergeson *v.* Sealey, 2 Atk. 412; Den *v.* Clark, 5 Halstd. 217; Hart *v.* Deamer, 6 Wend. 497; Faulder *v.* Silk, 3 Campb. 126. The fact that a traverse of the finding had been filed by the petitioner is no answer: Purdon's Digest 982, pl. 16; Frey's Est., 3 W. N. C. 371; McGinnis *v.* Commonwealth, 74 Pa. St. Rep. 248; Rogers *v.* Walker, 6 Barr 375; Noel *v.* Karper, 53 Pa. St. Rep. 97; Clark *v.* Caldwell, 6 Watts 139; In re Clapp, 20 How. Prac. Rep. 388. But there is no evidence which so bears upon the question of time at which the deed was executed, as to affect its integrity; and this the law requires to an approximate degree at least. Even the Master reports that "there was no, or very slight, evidence of any bad or imprudent bargains made by" Jacob A. Miskey. In the following cases intoxication was unsuccessfully set up as a ground for avoidance of contracts made by a man of intemperate habits: Lewis *v.* Baird, 3 McLean 57; Warnock *v.* Campbell, 25 N. J. Equity 486; Johnson *v.* Phifer, 6 Nebraska 402; Johnson *v.* Rockwell, 12 Indiana 77; Maxwell et ux. *v.* Pittenger, 2 Green's Ch. Rep. (N. J.) 156; Belcher *v.* Belcher, 10 Yerger 121. There was no undue influence as assumed by the Master, such as is recognized by the law to warrant the setting aside of the deed. The cases of Darlington's Appeal, 86 Pa. St. Rep. 512; Huguenin *v.* Baseley, 14 Vesey 273; Cuthbertson's Appeal, 38 Legal Int. 124; s. c., 97 Pa. St. Rep. 163; Hoghton *v.* Hoghton, 15 Beavan 278; Turner *v.* Collins, Law Rep., 7 Ch. Appeals 329; relied on by the Master, do not sustain his conclusion. See on the contrary, Jenkins *v.* Pye, 12 Peters 241; Hadley *v.* Latimer, 3 Yerger 537; Greenfield's Est., 14 Pa. St. Rep. (2 Harris) 503.

*George M. Conarroe* and *Samuel C. Perkins,* for appellee.—The finding of an inquisition of lunacy or habitual drunkenness is but prima facie evidence, whichever way it may be; it shifts the burden of proof, nothing more; it is not conclusive: Sill *v.* McKnight, 7 W. & S. 244; Leckey *v.* Cunningham, 56 Pa. St. Rep. 370; Klohs *v.* Klohs, 61 Id. 245; McGinnis *v.* Commonwealth, 74 Id. 245; Bennet *v.* Vade, 2 Atk. 324. It is not necessary, to invalidate a deed, that proof of intoxication or mental incapacity at the time of its execution be adduced: Jones's Appeal, 37 Leg. Int. 376; s. c., 11 W. N. C. 258. Nor is the onus on the plaintiff, as appellants contend, to prove specific and actual fraud at the time of the execution of the deed; the contrary of this is well settled: Cuthbertson's Appeal, 97 Pa. St. Rep. 163; Darlington's Appeal,

86 Id. 518. Jenkins v. Pye, cited by appellants, is overruled
by Taylor v. Taylor, 8 How. U. S. Rep. 201, as to the particu-
lar point for which it is relied upon.   The deed of trust was
prepared by William L. Hirst, who was Anthony Miskey's
attorney.   Jacob A. Miskey had no " independent advice " of
any kind ; and there is no proof that the deed was ever read
by or to him, or that he understood it.   Without reference to
actual fraud the absence of a power of revocation in the
donor requires clear proof that he expressly directed it to be
omitted, and in the absence of such proof the deed will be
set aside :  May on Voluntary Conveyances 451 ; Russell's
Appeal, 75 Pa. St. Rep. 269, 289.   The burden of proof is on
the person claiming the benefit under the deed.   The bene-
ficiary must clearly and affirmatively show that the grantor or
donor (a) fully knew what he was doing ; (b) was entirely
competent to act ; (c) was wholly free from undue influence ;
(d) had independent advice ; (e) that the transaction was
righteous : Comstock v. Comstock, 57 Barbour N. Y. Rep.
453, 470 ; Boyd v. Boyd, 66 Pa. St. Rep. 283 ; Rhodes v. Bate,
Law Rep. 1 Chanc. App. Cases 252 ; Turner v. Collins, Law
Rep., 7 Chanc. App. Cases 329 ; Savery v. King, 5 H. of L.
Cases 627 ; Hoghton v. Hoghton, 15 Beavan 278 ; Cooke v.
Lamotte, Id. 241 ; Boyd v. De La Montagnie, 73 N. Y. Rep.
498 ; Coleman v. Phelps, MSS. N. Y. Case ; Whelan v. Whe-
lan, 3 Cowen 537 ; Russell's Appeal, Darlington's Appeal,
Cuthbertson's Appeal, Jones's Appeal, *supra*.   The present is
a case not only of constructive but of an actual fraud, by
which it was sought to deprive the wife and child of Jacob A.
Miskey of any share in his property, and of the support which
naturally belonged to them, and this for the benefit of his
father, mother and sister, who were in affluent circumstances.
To sustain this deed would, as Judge SHARSWOOD said in
Cuthbertson's Appeal, " open the door wide for the arts of
the cunning and designing to succeed in their nefarious pur-
poses."

Mr. Justice GREEN delivered the opinion of the court,
October 2d, 1883.

This was a proceeding on the equity side of the court
below.   It was a bill, the purpose of which was to procure a
decree, setting aside a voluntary conveyance, made by a son
to his father of the whole of his estate upon certain trusts
therein stated.   The property conveyed was personal estate,
and by the terms of the deed, the income was to be received
by the grantor during his life.   After his death the grantee
was to pay ten thousand dollars, at his discretion, to the only

child of the grantor, and the remainder of the estate was to be divided equally between his father, mother and sister.

The value of the property conveyed was about $70,000, and the only consideration for it stated in the deed was the sum of five dollars, which, it is said and not denied, was never paid. Jacob A. Miskey, the grantor, had a wife, and one child, a son, about fifteen years of age at the time of his death. No provision whatever was made for the wife and none for the child except the payment of $10,000 in the manner stated. The deed contained no power of revocation. Miskey's wife and child were living apart from him at the time of his death and for some sixteen months prior thereto, the separation having been occasioned, as was alleged and found by the Master, by his habits of gross and long-continued intoxication and disorderly conduct in his household. The deed was impeached upon various grounds, principally, want of consideration, undue influence exerted by the father, mother and sister, great mental weakness resulting from his long-continued and excessive use of intoxicating liquor, and fraud and deception practiced upon him by the donees named in the deed. An answer was filed denying the allegations of the bill and after replication the case was referred to a Master, who reported a decree declaring the deed to be fraudulent and void, and ordering it to be delivered up to be cancelled, and ordering also a return of the various stocks and securities conveyed by the deed. An examination of the Master's report discloses the various considerations upon which his findings of fact and law were based. He does not find that the deed from Jacob A. Miskey to Anthony Miskey his father, was procured to be made by actual fraud and imposition practiced upon the son by the father, but that certain facts were shown to have existed, and certain other facts which ought to appear in support of such an instrument do not appear, and are not to be found in the testimony, and that the combined effect of these affirmative and negative facts is such that an inference of fraud arises sufficient to invalidate the deed. Thus he finds that the conveyance was purely voluntary and without consideration; that it contained no provision whatever for the support of the wife of the grantor, and no adequate provision for the support of his only child; that the grantor had for several years before, and up to the time of the execution of the deed to his father, been given to habits of gross intoxication and to the excessive and inordinate use of alcoholic liquors, insomuch that he had become, and was, an habitual drunkard; that the deed contained no power of revocation, and that there was no testimony in the case showing that this fact was known to him or was in any manner explained to him; that it did not appear

that the deed was read over or explained to him at or before its execution; that the grantor was, at the time the deed was signed, and always had been, especially subject to the parental influence of his father, and that from all the testimony in the case it was fairly to be inferred that the deed was procured to be made by means of the exertion of that influence: that the grantor entertained a strong affection for both his wife and his child and that they had done nothing to forfeit either his affection or their right to adequate protection and support from him and his estate; that the grantor had become very much impaired both in mind and body in consequence of his excessive use of alcoholic liquor, and that the deed to his father was not the intelligent act of Jacob A. Miskey when in the fair possession of his faculties. The Master applies the equitable rules, that the absence of a power of revocation from a voluntary deed conveying the property of a grantor, is a circumstance which may be availed of to set aside the deed on the ground of mistake, and that where one occupying a confidential relation with another takes a voluntary benefit from the person reposing the confidence, he is subject to a duty to prove affirmatively that the conveyance was the intelligent and deliberate act of the grantor, free from the exercise of the influence of the relation existing between the parties. As to many of these findings there is no controversy. There is no question that the conveyance was purely voluntary, that it contained no provision for the support of the wife, and a provision of but ten thousand dollars for support of the child. As the estate transferred amounted to seventy thousand dollars, we think it clear that ten thousand dollars, or one seventh of the whole, was an inadequate provision for the child. A mere inspection of the deed shows that it contains no power of revocation, and there is no testimony that it was Jacob A. Miskey's expressed desire that it should contain no such power, or that the fact of its omission was explained to him or in any way known to him. It is also quite clear that he was much attached to both his wife and child, and treated them with kindness and sincere affection, when in the full possession of his faculties. There is nothing in the testimony showing that either of them had done anything to forfeit his regard for them or their right to his protection, and to support from his estate. The act of his wife in leaving him was occasioned solely by his habits of intoxication and his conduct when in that condition. The Master has so found, and the evidence abundantly justifies his finding on that subject. The only remaining matters of fact involved in the controversy are those which relate to his use of liquor and habit of intoxication, and the effect thereby produced upon his mind,

and the extent and character of the parental influence to which he was subject, and its employment in producing the execution of the deed in question.

There is considerable testimony in the case of persons who saw Jacob A. Miskey with greater or less frequency, and say that they never, or very seldom, saw him intoxicated.   Most, perhaps all, of these witnesses testify that in their opinion he was of sound mind, capable of transacting business and of making contracts, and of ample testamentary capacity.   A number had business transactions with him and base their opinions upon those transactions, and upon the negative fact that they did not see him intoxicated.   Of course a great deal of this testimony is of a negative character, and the opinions expressed are necessarily affected to some extent by that consideration.   One who is frequently drunk may nevertheless in his sober moments have adequate capacity for the transaction of business.   In this case it is not disputed that Jacob A. Miskey accumulated quite a fortune, and there is no evidence that he had made unfortunate transactions or squandered his means.   Were there no other evidence in the case except the testimony of the witnesses to whom we are now referring, we should regard the contention of the appellants as sustained on this branch of the case.   But when we regard the character, and the extent of the testimony on the other side, and the great number of the witnesses who testify to facts observed by themselves, of almost daily occurrence, who had the very best opportunities of observation, whose testimony is not contradicted, who had no motive for concealing or exaggerating the truth, we cannot resist the conclusion that the Master's findings on this subject were not only justified but demanded by the evidence before him.   It is not necessary, and would scarcely be proper, to review in detail, in this opinion, the whole of the testimony on this subject.   It came largely from bar-tenders and saloon keepers from whom he was in the daily habit of obtaining liquor, and from police officers who, at his father's request, watched him, cared for him, and frequently took him home in a condition of gross intoxication. One of the witnesses, John Able, Jr., who was a saloon keeper, and had known him for many years, and said he was a drinking man from 1859, described his habit of coming to his saloon and getting his flask or bottle filled every week, and thus testified :  " During 1868 and 1869 the bottle would average about once a week, and three times a week with the flask during the same week.   The flask generally Monday, Wednesday and Friday, and the bottle on Saturday for ' home use,' which was his remark.   I considered him a great drinker from 1868 to 1875, in the fall.   There was very little deviation.   He

was worse as a drinker toward 1874 and 1875. I have indeed seen a great many hard drinkers. I must say one thing for Jacob Miskey, that during the years 1873, 1874 and 1875 I never saw a man in such a beastly state of intoxication, so often as I saw him. It appeared to me, and I saw him nearly every morning, about a quarter of ten in the morning, that he was in a beastly state of intoxication at that hour in the morning on his way to the office." After describing Miskey's habit of constant and excessive drinking with much more detail, the witness said further: "His memory in 1874 and 1875 seemed to be very much impaired, because I don't think he could recollect what occurred from one hour to another. In my opinion he was most undoubtedly an habitual drunkard. During 1874 and 1875 I don't think that mentally he retained his manhood." . . . . . "In 1874 and 1875 I did not consider him a sane man. He acted like as if his brain was diseased—softening or something or other. I did not in fact consider he was a responsible man for his actions during those two years. I do not consider that during those two years he was capable of properly conducting business." . . . . . "I think those things" (a number of facts to which he had testified) "indicated that his mind was unsound. He was imbecile or idiotic."

James M. West, a member of the bar, who occupied an office in the rear of that of A. Miskey & Son, said: "I suppose I saw young Jacob Miskey every day—had to pass his office door to get into mine. . . . . . I think he was the hardest drinker, for a man of his age, that I ever knew. . . . . . I don't think I ever saw him when he was entirely sober. He would be tolerably free from liquor in the early part of the morning, but by two or three o'clock in the afternoon he would be very drunk—this was a constant occurrence—he manifested it very often by making most terribly uncouth noises in his room, to the great annoyance of myself and those in my office. . . . . . I have had occasion to go into his office and found him frequently in such a condition that he would be unable apparently to understand and answer a question that I would ask him. . . . . . Personally he had all the appearance of being a habitual drunkard, very much bloated, and the general appearance of a man who drinks hard. . . . . . As far as I can judge, most of the time he was not in condition to attend to any business at all. What little business I had with them I always transacted with the father on that account. I did not consider him fit to attend to business. . . . . . I mean to say this: that my judgment was that he went to bed drunk at night, was so thoroughly saturated with the liquor that it was'nt worked off him in the morning by the

night's sleep, and that when I would see him the next morning he was still under the effects of a previous day's dissipation."

Frederick Day, also a member of the bar, having an office in the same building across the hall from A. Miskey & Son, testified: " He was unquestionably a constant drinker, there is no doubt about that. . . . . . His appearance was that of a man who was, to put it plainly, soaked in whiskey. . . . . . He really looked to me, and his speech and action indicated, that he was a man who was semi-idiotic, imbecile. I wish to be understood that it was not the mere temporary effect of whiskey, but he seemed to have got to that point when he was becoming—well, idiotic is the only expressive word." William P. Jones, who was a bar-tender, first at Prosser's on Market street, and afterwards at Price's restaurant on Chestnut street, said he first knew Jacob A. Miskey at Prosser's in 1865, when he would come about three times a week, get a drink and his flask filled, and was then a moderate drinker. Afterwards he saw him at Price's until in July, 1875. At the latter place, the witness testified, " He used to come there twice every day. I was behind the bar. He would come there about nine or ten—about ten—and get whiskey, and I would fill his flask, generally every morning, and also at noon —at dinner time he would get his flask filled." . . . . . " When. I saw him at Price's he used to drink more. It grew on him. I can hardly describe it. He would take about half of an ordinary bar tumbler full of whiskey." Being asked how Miskey ranked as a whiskey drinker, as a moderate one or otherwise, he answered: " Otherwise, I should say he excelled any one I ever saw." . . . . . " I have seen him intoxicated. For the last three years I could hardly tell when he was not intoxicated. He was of very full habit, flushed about his face. He indicated a man that drank very hard. A man that did not know him would say that. I have frequently seen him stagger—generally before three—somewhere in the neighborhood of one, when he came to dinner. Q. So far as you were able to judge during the last three years, what was his mental capacity? A. He didn't really seem to know sometimes what he had said to me a few minutes before. I judge it was excessive drinking that did it. . . . . Q. In your opinion was he, or was he not, an habitual drunkard? A. He was—one confirmed drunkard for the last three years. I could scarcely tell when he was sober: if he was, it was in the morning when he first came." George R. Stocker, who lived next door to Miskey during 1874, and to the time of his death, after describing occasions when he saw him intoxicated, was asked: Q. In your opinion was Mr. Miskey, dur-

[Miskey's Appeal.]

ing the time you knew him, an habitual drunkard or not?
A. "Yes, sir; he was undoubtedly, that is, I would say that
eighty or eighty-five per cent. of the time that I knew him I
should say he was drunk. Q. What was his capacity, as far
as you know, to transact business? A. I should say he had
none at all for transacting business." William H. Price, who
was a restaurateur at Price's on Chestnut street, said that he
knew Jacob A. Miskey from 1860, but more particularly from
1871, when he came to his father's restaurant where he was
cashier. "He visited our place on an average four or five
times a day. . . . . . He came there mostly to drink whiskey.
He would get a small flask filled with whiskey, which I judge
he carried in his pocket. He would first come between nine
and ten A. M., on his way to his office, I judge. He came to
drink whiskey. When he first came in the morning, or at no
time was he perfectly sober; he was generally not sober by
no means; he was trembling, and he acted to me more like a
man who was getting off a spree." · The witness further de-
scribes the frequency of Miskey's drinks, and was asked:
Q. What was his mental condition? A. "Well, I think it
was very poor. I have seen a great many drinking and
drunken men. I think he excelled all men I ever did see in
regard to drink. I don't think in my opinion he was able to
take care of himself after he left me. . . . . . I have had
conversations with him. He appeared not like a man to me,
but a child. He talked more foolishness, and he appeared
more like a child. His memory was poor. . . . . . I think he
was an habitual drunkard."

The foregoing are mere fragments of a huge mass of testi-
mony of a similar character, which abundantly justifies the
findings of the Master, in this branch of the case, in the fol-
lowing words:—"He became more and more the victim of his
intemperate and insatiable thirst for whiskey. His sprees were
frequent and more than once he had the delirium tremens. He
would come home and be brought home by policemen and
others at all hours of the night drunk, and when in that con-
dition he would behave himself in a rude, noisy, and unkind
manner, to his wife and child, breaking the furniture and be-
having in such a manner that the house was not a quiet and
desirable home, and he annoyed and disturbed his neighbors.
His debauches would last for a week or more, to be followed
by sickness at home, when his wife and mother would nurse him.
His habits were such and so well known, that when he would
be away from the place of business of the firm, his father
would apply to the police to find him and get him to go home;
and this applies to the police officers in Germantown as well as
those in the city. Frequently nurses and police officers were

11 OUTERBRIDGE.—40

employed by Mr. Anthony Miskey to nurse and take care of him when he was gotten off from his debauches and was sick in consequence.   The result of these debauches and the excessive amount of whiskey he drank began to tell upon his phyiscal condition.   He became slovenly in his habits, his appearance became that of a drunkard, he was bloated and besotted, and maudlin-looking, he appeared to be saturated with liquor; he was bloated and had the general appearance of a man who drinks hard.   In the early part of the day he would be tolerably free from liquor, but toward the afternoon he would be well drunk, and would make uncouth noises in his office, such as loud hallooing, imitating cats, barking like a dog, and various other noises, some of the witnesses describe him as having the appearance of a man soaked in whiskey.   At the taverns where he had his debauches his performances were so filthy as to be unfit for further description in this report.   He reeled in the streets of the city, in the highways of Germantown, and became a shame and a disgrace and humiliation, to his own and his wife's family. . . . . . At one time Mr. Anthony Miskey consulted physicians in reference to the propriety of putting him in an asylum, but this unfortunately was never done. He was attended repeatedly by his physicians in his sickness, produced by his excessive use of whiskey, and he was by them remonstrated with on the subject, but it was of no avail. . . . . . The Master has no hesitation in reporting as a fact that at the time of the execution of the deed Jacob A. Miskey was an habitual drunkard, and had been so for several years previously thereto. . . . . . He had 'a fixed habit of drunkenness.'   He was 'habituated to intemperance whenever the opportunity offered.'   And he himself made this opportunity, filling his flask, silently drinking by himself, hiding his stores of whiskey in unusual places about the house, and getting continually drunk.   And this state of things continued during the last six or eight months of his life, covering the period of the execution of the deed of trust."   A patient and attentive examination of the testimony satisfies us that all the details of this finding were fully established by the evidence before the Master.

It was argued that because the proceeding in habitual drunkenness resulted in a finding by the jury that Jacob A. Miskey was not an habitual drunkard, that finding is conclusive upon the parties and can not now be impeached.   We do not regard this position as tenable.   All the authorities concur in holding that the inquisition whether of lunacy or habitual drunkenness is only prima facie evidence of mental infirmity during the period found, and its effect is to shift the burden of proof to the party asserting capacity: Sill *v.* Mc-

Knight, 7 W. & S. 244; Leckey *v.* Cunningham, 6 P. F. S. 370; Klohs *v.* Klohs, 11 P. F. S. 245; McGinnis *v.* Commonwealth, 24 P. F. S. 245. As this is the rule in cases where the finding is affirmative, of the fact of lunacy or drunkenness, it certainly can have no higher effect where the finding is merely negative. Moreover, this is a proceeding in a court of chancery to set aside an alleged improvident deed, partly upon the ground that the mind of the grantor had become greatly weakened and impaired by the long-continued, and execessive use of alcoholic liquor, and not upon the mere technical, statutory fact, of habitual drunkenness. The conscience of the court, if satisfied of the truth of the allegation upon the whole of the evidence taken, certainly would not be relieved by the statement that a jury of laymen in another proceeding to declare the party an habitual drunkard, had found that the charge was not established. This would be so even if the evidence in the two proceedings were the same, much more would it be so where, as here, considerably more testimony was given before the Master than before the jury. The proceedings were not the same nor was the issue the same. But in any event the prima facies of the inquest has been overthrown by the preponderating testimony taken before the Master. The finding of the Master that Miskey was an habitual drunkard has no relation to the proceeding in habitual drunkenness. It does not affect it one way or the other. He does not declare that because he has so found, the deed of trust is void, but he uses the facts found by him to show the character of Miskey's mental qualifications to appreciate and to execute the deed. He thus states the bearing of the fact of habitual drunkenness found by him, upon the case: "Yet this fact and all others in this connection, have a material bearing upon the main question, whether the deed was the intelligent act, uninfluenced, of a man competent, by reason of the full possession of his faculties, to execute such an instrument."

On the question of parental influence, the Master finds that Jacob A. Miskey never passed beyond the parental influence or control of his father. He was with his father as clerk before he attained his majority, and on the day he became of age his father took him into partnership, and this relation continued for eighteen years. After that, and to the time of his death, he continued under his father's care and influence.

A strong mutual affection at all times subsisted between them, and the Master reports that there was no reason to doubt "what a very intelligent witness said about them, 'There was no man alive that could do with Jacob Miskey

what his father could. I think he would do for his father what he would not do for any living person on earth; from his affection and regard for his father.'" After the dissolution of the partnership which was the act of the father, in 1873, he was still employed and paid some compensation by his father for some months, his rent and other bills were paid through his father's bank account, and the counsel who defended him in the proceeding in habitual drunkenness, were employed and paid by his father. During his last sickness and for some time before, Anthony Miskey came to his son's house every day, controlled him in the use of money, paid the servants, and gave orders shortly before his son's death that Jacob's wife and son should not be left alone in the room with him. Many other facts showing the character and extent of the influence and control exercised by Anthony Miskey over his son are set forth in the Master's report, are fully established by the testimony, and indeed are not contradicted by any opposing testimony. The Master also finds that there was no reasonable motive shown for the deed, as Jacob's father was a man of wealth, and his mother and sister were well provided for, and in his rational moments he always regarded his wife and son with great affection. He further finds, upon uncontradicted testimony that apart from the facts of execution and acknowledgment there is no evidence that Jacob A. Miskey read the deed or heard it read, or that he clearly understood its effect; and that there was no affirmative evidence to show that he never knew there was no power of revocation in the deed, or that he had a deliberate intent to make the deed irrevocable. The Master sums up his report on this branch of the case thus: " The whole testimony in the cause, with all the circumstances surrounding the deed satisfies the Master that the deed of trust was the result of the undue parental influence of Anthony Miskey." We think this conclusion is a legitimate deduction from the evidence. These facts being established, the legal and equitable principles applicable to the case, render it of comparatively easy solution.

In Russell's Appeal, 25 P. F. S., on page 289, AGNEW, C. J., referring to the effect of the absence of a power of revocation in a marriage settlement, and the necessity of an intent to make the gift irrevocable, appearing in the case, says: " The cases cited by the Master show very distinctly that the actual intent of the donor is necessary; and in the absence of a certain intent to make the gift irrevocable, the omission of a power to revoke is prima facie evidence of a mistake, and casts the burthen of supporting the settlement upon him who, without consideration or a motive to benefit him or protect the donor, claims a mere gratuity against one who is sui juris

and capable of taking care of his own estate." The report of Mr. Robb, the Master in that case, which was ordered to be printed with the opinion of the court, contains a most able and exhaustive review of the law in such cases. He cites a number of recent English cases which were fully recognized as authoritative in the opinion of this court. Among others is that of Wollaston v. Tribe, Law Reps. 9 Eq. 44, in which it was held that a person taking a benefit under a voluntary gift, which is not subject to a power of revocation, has thrown upon him the burden of proving that the gift was meant by the donor to be irrevocable, and that a voluntary gift not subject to a power of revocation, but not meant to be irrevocable may be set aside by the donor. In Coutts v. Acworth, Law Reps. 8 Eq. 558, it was held that the party taking a benefit under a voluntary settlement or gift containing no power of revocation, has thrown upon him the burden of proving that there was a distinct intention on the part of the donor to make the gift irrevocable. In Hall v. Hall, Law Reps. 14 Eq. 365, it was decided that " where, in a voluntary settlement of real estate a revocable deed would have answered the settlor's purpose as well as an irrevocable one, the absence of a power of revocation is prima facie evidence of mistake, and that evidence can only be rebutted by showing that the settlor had his attention pointedly called to the fact that the instrument was irrevocable, and that he could have equally effected his purpose by a revocable one."

Of course it is not pretended, and the Master in the present case did not decide, that the mere absence of a power of revocation is sufficient, of itself, to set aside the instrument. But that fact is a circumstance which throws the burden of proof upon the party taking the benefit, and in the absence of proof of a distinct intention to make the gift irrevocable, if the other circumstances of the case require it, the conveyance will be set aside. Other authorities to the same effect are: Huegenin v. Baseley, 14 Ves. 273 ; Phillipson v. Kerry, 32 Beav. 628 ; Garnsey v. Mundy, 13 Am. Law Reg. 345 ; May on Voluntary Conveyances, 451.

It needs only to be added in this connection that there was no affirmative proof of a distinct intention on the part of Jacob A. Miskey to make this gift irrevocable, nor is there any proof that his attention was ever called to the subject.

In regard to the effect of the parental relation, and the influence thereby exerted upon the transaction, the authorities are very clear, and are strikingly applicable to the facts of this case. This court has adopted and enforced the most advanced equity doctrines upon this subject. In Darlington's Appeal, 5 Norris 518, Mr. Justice Trunkey, in delivering the

opinion of this court, said : "Constructive fraud often exists where the parties to the contract have a special, confidential, or fiduciary relation, which affords the power and means to one to take advantage of or exercise undue influence over the other. Whenever from such relation considerable authority or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence by extracting any advantage to himself. A transaction between persons so situated is watched with extreme jealousy and solicitude, and if there be found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party. Owing to the near connection between the parties in many relations, the transaction itself is considered so suspicious as to cast the burden of proof upon the person who seeks to support it, to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscientious."

In Turner *v.* Collins, Law Rep., 7 Ch. App. 329, the Lord Chancellor, HATHERLY, said : "If the father himself takes a benefit then arises the jealousy of the court, and we have to consider how the child's intention was produced. And even if we find the intention which the instrument describes, still the question arises, how has that intention been produced? Influence is a thing which is assumed as between father and child, not that the influence is assumed to be unduly exercised, but that the influence is assumed, and it is then thrown upon the father, if he takes any benefit, to prove what is called the righteousness of the transaction, and the court has to see that every proper protection was thrown around the child, and that the child has deliberately and advisedly, and under protection, done that by which his father has obtained a benefit."

In the same opinion the Chancellor thus describes the character of the parental influence to be apprehended and guarded against: "When we talk of parental influence we do not think of terror in connection with it—that is not the primary idea—it is not terror and coercion, but kindness and affection which may bias the child's mind, and induce the child to do that which may be highly imprudent, and which if the child were properly protected he would never do."

This is the very kind of influence which existed in an eminent degree between Anthony Miskey and his son. In Huegenin *v.* Baseley, 14 Ves. 273, Lord ELDON thus presents the subject : "Take it that she intended to give it to him, it is by no means out of reach of principle. The question is, not whether she knew what she was doing, had done, or proposed

to do, but how the intention was produced; whether all that care and providence was placed round her, as against those who advised her, which from their situation and relation with respect to her they were bound to exert on her behalf."

In Hoghton v. Hoghton, 15 Beav. 278, the Master of the Rolls said: "I am of opinion, as I lately held in a case of Cook v. Lamotte, that wherever one person obtains by voluntary donation a large pecuniary benefit from another, the burthen of proving that the transaction is righteous, to use the expression of Lord ELDON in Gibson v. Joyes, falls on the person taking the benefit. But this proof is given if it be shown that the donor knew and understood what it was that he was doing. If, however, besides obtaining the benefit of this voluntary gift from the donor, the donor and donee were so situated towards each other that undue influence might have been exercised by the donee over the donor, then a new consideration is added, and the question is not, to use the words of Lord ELDON in Huegenin v. Basely, whether the donor knew what he was doing, but how this intention was produced; and though the donor was well aware of what he did, yet if his disposition to do so was produced by undue influence, the transaction would be set aside. In many cases the court, from the relations existing between the parties to the transaction, infers the probability of such undue influence having been exerted."

In Rhodes v. Bate, Law Rep., 1 Ch. App. Cases 252, Lord Justice TURNER said: "I take it to be a well established principle of this court that persons standing in a confidential relation towards others cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show to the satisfaction of the court that the person by whom the benefits have been conferred had competent and independent advice in conferring them. This, in my opinion, is a settled general principle of the court, and I do not think that either the age or the capacity of the person conferring the benefit, or the nature of the benefit conferred, affects this principle." In Savery v. King, 5 House of Lords Cases, p. 627, the Lord Chancellor said: "I must not be understood as questioning the position that a son may give up all or any portion of his property to his father without consideration. Undoubtedly he may do so: but then it is incumbent on the father, accepting such a benefit, to satisfy the court before which the transaction is impeached that the son fully understood what he was doing; that no artifice or contrivance was made use of to induce him to do the act complained of, and that the son had competent means of forming an independent judgment. The father is bound to make this out." The

same doctrine was asserted and applied in the cases of Comstock *v.* Comstock, 57 Barb. 453, and Boyd *v.* De La Montagnie, 73 N. Y. Rep. Court of Appeals 498, and by this court in cases of wills giving benefits to the persons who were instrumental in procuring their execution; in Boyd *v.* Boyd, 16 P. F. S. 283; Cuthbertson's Appeal, 1 Out. 163; and in Jones's Appeal, 39 Leg. Int. 52, which was a voluntary deed set aside by the court below, affirmed by this court, SHARSWOOD, C. J., saying: "It is sufficient to invalidate any instrument by a person of weak intellect to show that the person in whose favor it is framed held a situation of confidence with respect to the maker of such instrument."

In reference to the matter of "independent advice," it is to be observed that the deed was prepared by Mr. W. L. Hirst, a very eminent member of the bar of this Commonwealth, but that gentleman had previously been, and was at the time, the counsel of Mr. Anthony Miskey, and, in point of fact, he was employed and paid by the latter to defend his son in the proceedings in habitual drunkenness. In these circumstances Mr. Hirst cannot be regarded as the independent adviser of Jacob A. Miskey in the matter of the deed of trust, in which Anthony Miskey was so largely interested. Did time and space permit, it would be interesting and instructive to point out the many circumstances which indicate the presence and exertion of the parental influence of the father in procuring the execution of the deed of trust. But this work has been so well and ably done in the report of the learned Master, that it is unnecessary to repeat it here, and the already too great length of this opinion is admonitory of the necessity of curtailment. It has seemed to us appropriate to dwell with rather more than usual fullness upon our review of the case, because of the unusual character of the questions involved and the relief invoked, the very large amount at stake, and the earnestness, zeal and ability with which the argument was conducted by the learned counsel on both sides.

In brief, the controversy presents to us the case of a voluntary conveyance by a son to his father, mother and sister, of his entire estate, less a small provision for the only child of the grantor, the latter having at the time a wife for whom no provision was made, and a son for whom there was an inadequate provision, the father being of affluent circumstances, and the mother and sister being entirely comfortable and requiring no provision; the deed containing no power of revocation, and there being no proof that the grantor was conscious of that fact, or that his attention was called to it, and a revocable deed being just as serviceable for his purpose as one that was irrevocable; the grantor being at the time, and

[Miskey's Appeal.]

for many years previously, a person of grossly intemperate habits, in an almost constant state of intoxication, with mind and body greatly impaired and enfeebled thereby; the relation of parent and child existing between the principal grantee and the grantor, and there being no proof by any of the grantees independently of the deed itself that it was the intelligent, deliberate, and free act of the grantor, done of his own desire and accord, and no proof that the transaction was righteous and conscionable, and the evidence indicating with great force that the execution of the deed was procured by the active exertion of the parental influence of the father; the deed having been executed without independent advice of counsel representing the grantor alone, and having been prepared by one who was counsel for the father. In our judgment, so strong a combination of circumstances against the validity of the instrument in question, is not found in any of the reported cases, and upon a most patient and careful review of the entire case we cannot but think that the decree recommended by the Master, and made by the court below, is required by the principles we have considered, and the practice of the courts, is most consonant with the teachings of reason, of justice and humanity, and therefore demands the sanction and approval of this court.

Decree affirmed at the costs of the appellants.