## Yeakel, Executrix, Appellant, *v.* McAtee.

*Gift—Parent and child—Fraud—Irrevocable gift.*

If there is no evidence which tends to show that a donor was incompe-
tent to make a gift, or which raises a suspicion of fraud or undue influ-
ence on the part of the donee, the capacity of the donor and the fairness
of the transaction will be presumed, unless the relation between the par-
ties is such that the policy of the law casts upon the donee the burden of

showing that the gift was the voluntary and intelligent act of the donor. In the absence of such evidence this burden does not rest on children who receive gifts from their parents.

It is not incumbent on a child who receives a gift from a parent to prove affirmately, in a proceeding to annul the gift, that the donor was told she might outlive the donee, or that the gift was irrevocable.

A mother gave certain bonds and stock to her daughter. The evidence affirmatively showed the voluntary character of the gift. It also appeared that the mother was not impoverished by the gifts and that she made no complaint during the life of her daughter that she had not retained property enough to afford her a comfortable maintenance. From the evidence it appeared that the mother had a strong will, and was not controlled by her daughter or anybody else. *Held* that the mother was not entitled after the death of the daughter to have the gifts rescinded.

*Evidence—Competency of witness—Decedents' estates.*

In an action by a mother against the estate of a daughter to rescind a gift made by the plaintiff to her daughter, the plaintiff is not a competent witness under the act of May 23, 1887, P. L. 158.

Argued Jan. 30, 1893.  Appeal, No. 74, July T., 1892, by plaintiff, Sarah Yeakel, executrix of Maria Corson, from decree of C. P. Montgomery Co., Dec. T., 1886, No. 3, on bill in equity against J. Q. McAtee and J. Q. McAtee, executor of Mary Ann Corson.  Before PAXSON, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.

Bill to compel transfer of stock and bonds.

The case was referred to B. E. Chain, Esq., as master, who reported a decree in favor of the plaintiff.  Exceptions to the master's report were sustained by the court in the following opinion by SWARTZ, P. J.:

" The master states clearly the facts upon which he bases his conclusion.  There was before him a great mass of testimony. Much of this evidence was taken in the prior controversies under the will of Mary A. Corson and submitted to the master in the present equity proceeding.  The report fails to state clearly what portions of this testimony are competent and relevant in the present controversy.

" Maria Corson, the mother of Mary A. Corson, began the litigation by contesting the will of her daughter on the grounds of her daughter's mental weakness and the fraud and undue influence on the part of said John Q. McAtee, the defendant in the present bill.  Other litigation followed and the equity pro-

ceeding was instituted. Mrs. Corson also made an effort to surcharge Mr. McAtee, the executor of the daughter, with the value of certain stocks which McAtee received from the daughter as a gift. The will was sustained and the effort to surcharge the executor with the value of the stocks failed. The testimony taken before the auditor in the latter controversy was submitted to the master under the following agreement of counsel: ' Agreed that the testimony taken before the auditor in the estate of Mary Ann Corson and filed May 7, 1888, shall be taken in this case with the same force and effect as if the witnesses had appeared, been qualified and examined in this case, but the testimony so received shall be and is subject to all legal exceptions by the counsel on either side, this agreement to include all documentary evidence offered in said audit, subject to the same objection.'

"At the death of Mary A. Corson the following stocks and bonds stood in her name : Sixty-six shares of preferred stock of the Northern Pacific R. R. Co., bonds of the United States for twenty-four hundred dollars, and three and one half shares of the Jefferson Fire Ins. Co. The complainant alleges in her bill that these stocks and bonds are her property and prays that they may be transferred to her. She claims that she never knowingly transferred these stocks and bonds, that they are still her property and never belonged to her daughter. The testimony of the complainant submitted under the foregoing agreement was received and the master says he fully considered her evidence. [She was not a competent witness. She does not claim these stocks by devolution on the death of the owner, but claims them as a part of her own estate by a title prior to the death of her daughter. Her interest is adverse to the right of the deceased and she is incompetent as to any matter occurring prior to the death of her daughter. Section 5, clause (*e*), act of May 23, 1887. Nor can her testimony be admitted as a deposition, for when she was examined before the auditor, Mary A. Corson was dead.] [1] [Nor is she competent against J. Q. McAtee for whatever fraud or wrong he may have perpetrated, if we are to believe her evidence, enured to the benefit of Mary A. Corson. Under the complainant's allegation he was but the instrument or agent to put the stocks in the name of the deceased. Under the act of 1887, the pro-

hibition extends to any matter occurring before the death of Mary A. Corson, whether it took place between the surviving party and the deceased or any other party :] [2] Southerland v. Ross, 140 Pa. 379. This evidence was submitted prior to the act of June 11, 1891, P. L. 287. [Maria Corson, the complainant, died shortly after her evidence was submitted. John Q. McAtee was competent to testify against her, for she was living at the time his evidence was offered. He was not adverse to the interest of the deceased, but on the contrary was testifying for the estate.] [3] Objection is made by the defendant to the testimony of George Follett, taken under a commission to the state of New York. This evidence was taken in the proceedings between Maria Corson, the contestant of the will of Mary A. Corson, and John Q. McAtee, the executor who was cited to show cause why an issue should not be awarded to try the validity of the will. He appeared and successfully defended the probate of the will. This deposition was therefore taken in a controversy between the same parties and involved, at least in part, the same subject-matter, to wit: the fraud and undue influence of Mr. McAtee. We think the testimony is competent, but of little importance. True, it shows that the sixty-six shares of Pacific railroad stock were transferred upon the books of the company but two days before Mary A. Corson's death. This was sufficient to give the daughter a complete legal title to the stock. The transfer was absolute; whether the certificate was received by her in her lifetime is immaterial. The best evidence of ownership is the transfer on the books of the company. The certificate is but secondary evidence of such ownership; it is nothing more than an official declaration by the company of what already appears on their books: Roberts's Appeal, 85 Pa. 87.

"Much of the evidence found in the two hundred pages of printed testimony is irrelevant. It is hardly fair to the master or the court to hurl this mass of testimony at us, and say, ' We, as counsel, object to this evidence, but you pick out that which you find relevant and competent.' This method is labor-saving to counsel, but I can't say that it is altogether satisfactory to the master or the court. While the master was in error in considering the testimony of the complainant, it does not appear that it influenced him in his findings of fact. He evidently did

not believe her, for he finds that she made the transfers of stocks and bonds and knew that she made the assignments to her daughter. [His findings are approved with the following modifications and additions. We cannot agree that Maria Corson 'was entirely dependent on her daughter.' True, the daughter was her faithful attendant in her blind and helpless condition, but she had sufficient means to provide other helpers.] [4] She had relatives who were quick to offer their services after the daughter's death, even in her alleged reduced financial condition. [The distribution of her property, that is, the gifts to her daughter, did not 'render her without means.' She was still the owner of real estate worth from eight to ten thousand dollars; she also had some little personal estate. With her frugal habits and simple tastes this sum was sufficient to maintain her the rest of her days, even if her life had been prolonged beyond expectation.] [5] Mr. McAtee as one of the legatees under the will of Mary A. Corson was not interested in having the bonds transferred to her. Their bonds were transferred to Mary A. Corson in April, 1885, and the will which makes Mr. McAtee one of the residuary legatees was not executed until February, 1886. The prior will gave him a specific legacy which was in no way dependent upon this transfer of bonds.

" This finding, if confined to the railroad stocks, is supported by the evidence. It is by no means clear that the complainant 'never anticipated that her daughter would die first.' Her own will in 1885 provided for this very contingency. She gave everything to her daughter, but, if the daughter died first, then to the children of Sarah Yeakle and others. That she fully understood this will is shown by the subscribing witnesses who testify that she gave her reasons for the bequest over should she survive the daughter. [The master does not question the truthfulness of the testimony of Mr. McAtee and his wife. There is no competent evidence contradicting their testimony as to declarations made by the complainant, 'that Mary kept house for her and nursed her and cared for her so many years during her blindness, . . . . that she would give them (the government bonds) as compensation to her for her kindness and affection in nursing her.' The master should have found as a fact that the foregoing was the reason assigned by the mother for the transfer of the bonds to the daughter.] [6]

Likewise the complainant declared that she would retain her 'scrip'—she might need money—but would give her daughter the railroad stocks and 'then she would have nothing to worry her mind about;' 'she (the mother) could die in peace and think about other matters;' that 'she had willed it to her, and Mary was her only heir anyhow.' [There is no evidence to sustain the allegations of fraud or undue influence on the part of Mr. McAtee. The transfers to the daughter were not suggested by him; he did not advise them, he did not solicit the mother to make them. Through her importunities he assisted her in carrying out her purposes.] [7] This was not the case of a child taking care of an aged mother of feeble mind, for the plaintiff's witnesses say that 'the mother in her old age, at the time of her daughter's death, had a stronger mind than the daughter ever had.' Another of the complainant's witnesses, in answer to the question, 'Which one could influence the other one?' replied, 'The mother, of course.'

" The master bases his conclusions upon two deductions that he draws from this evidence. First, The mother never anticipated that the daughter would die first and her confidential adviser and agent failed to call this contingency to her mind. Second, The confidential adviser never informed her that the gifts were irrevocable.

" As already shown their findings have no application to the United States bonds. She gave them to her daughter in April, 1885, and in January of the same year she made her will, in which she carefully and intelligently provided for the contingency that she might survive her daughter. [She must have known that the transfer was irrevocable; she intended to give it that effect, for she declared that the daughter was to take these bonds as compensation for her long devoted services to her.] [8] But suppose the master is correct in his findings. Can it be said that the daughter may not hold these bonds unless she first shows that her mother knew that the transfer was irrevocable, and that she might survive the daughter? If under the circumstances this burden is cast upon the daughter, then few gifts from parent to child can stand. [At the time the bonds were transferred the mother had an estate of at least $15,000;] [9] her only child, sixty years old, remained with her and kept house for her. For twenty years this child admin-

istered to every want of her blind mother. The mother is continually speaking in the highest terms of the filial devotion of this daughter. The mother, now eighty-seven years old, knowing that her days can be but few, declares that she will give to her daughter one sixth of her estate as an appreciation for this devotion and affection. She gives her money, which amounts to but one hundred dollars per year for the last twenty-five years' services; it is a small sum, but it shows her gratitude. But the daughter as soon as she had the money is compelled to return it, because she cannot show that she told her mother· that such gifts were irrevocable and because she forgot to remind her that life is uncertain and that the child may die before the parent.

" We must not encourage children in their efforts to secure compensation for care bestowed upon parents, but this does not mean that a child must not take such compensation voluntarily given by a parent who is financially able to pay over the money as a token of her appreciation of the child's loving, faithful devotion. [The daughter held these bonds for more than a year·before the mother makes any claim to them. The interest was paid to the daughter in several payments for one year. There is no doubt in our mind that the mother fully understood that these bonds belonged to her daughter.] [10]   [The transfer was made with a full knowledge of its import and the mother intended to give her child an absolute title.] [11]   Is there anything to impeach the daughter's title to the sixty-six shares of railroad stock ? [These stocks were worth at the time of the transfer thirty-six hundred and thirty dollars. They were given to the daughter because she was the only child and heir, to save the mother all worry and annoyance over them and to avoid commissions and expenses in the settlement of the mother's estate.] [12]   We think a twofold error runs through the report of the master. First, he treats the case as if the gift proceeded from the child to the parent; and, secondly, he fails to draw the distinction between a gift to the daughter and one to a confidential adviser. The gift was not made to Mr. McAtee nor suggested by him. This is not the case of a spiritual adviser taking advantage of the relationship to fill his own pockets. It is true he was benefited by the gift of the stocks to the daughter, for he is interested in her will, but unless we find that the whole

transaction was a part of a fraudulent scheme to swell the daughter's estate for the purpose of benefiting himself, it proves nothing.

" There is no evidence upon which we can base actual fraud. The master finds no fraud, but concludes the gifts are void because, under the circumstances, they are against the policy of the law.   Miskey's Appeal, 107 Pa. 616, does not sustain the complainant's contention.   In that case the son deeded his property to his father, making but a slight provision for wife and child.   The son's mind was wrecked by habits of intemperance, and he never passed beyond the parental control or influence of the father.   The father was a man of large means and not in need of his son's gift.   Under such circumstances the donee must show that the donor understood that the gift he made was irrevocable or it cannot stand.   Even in this case it was said that the mere absence of a power of revocation is not sufficient of itself to set aside an instrument unless the other circumstances of the case required it.   What circumstance is there in the case before us to demand the return of stocks? Not the necessities of the complainant, for at the time of the filing of her bill she was possessed of an estate consisting of land worth eight to ten thousand dollars, and under the will of her daughter she was entitled not only to the income of the very stocks in question, but of all her daughter's estate.   The transfer of stocks is unlike the case of a trust where the grantor retains a life interest.   In the latter case he may well think that he retains such an interest as will enable him to recall his proposed disposition of the property, but it requires but a mild form of intelligence for a person to understand that a transfer of stocks as a gift, with immediate delivery of the certificate and evidences of title, means a final, absolute disposition of the property.   How could Mrs. Corson fail to understand that the transfer of the stocks to her daughter, in the presence of witnesses to whom she declared her knowledge of what she was about to do, meant an absolute disposition of her property so handed over to her daughter?

" [Where a gift is made by a child to a parent while the parental authority and influence still continue, it may well be that a presumption arises against the validity of such gift, but where the gift proceeds from the parent to the child there can

be no such presumption.] [13]   On the contrary, the presump-tion, if any, is in favor of the child, that the gift upon full de-livery is irrevocable and intended to aid the child.   There must be some evidence of undue means to shift this presumption: Cowee v. Cornell, 75 N. Y. 101.   That parents will, especially in old age, settle part of their estates upon their children, is the rule and not the exception.   Where there is no evidence of mental weakness, or fraud, or undue influence, a gift from pa-rent to child does not cast the burden upon the child to show that the gift was free, a voluntary and intended gift of the do-nor; certainly not where the evidence failed to establish that the gift was improvident.   But suppose the gift and relation-ship, standing alone, do raise the question of constructive fraud, the presumption is overcome by the fact that the gift to the daughter is no more than a just, adequate settlement by the parent upon an only child who spent much of her entire life caring for her helpless mother.   [But it is contended that al-though the spiritual adviser did not receive the gift, it was by reason of his relationship that the daughter secured the stocks, and therefore her title must be tested by the same rules of law that are applicable to the confidential adviser.   This is a violent assumption, for how can we say that the gifts to the daugh-ter are the result of the intimate and friendly relation of Mr. McAtee and Mrs. Corson?   What evidence is there that the daughter is indebted to Mr. McAtee for the gifts?   There is no evidence of any act, word or deed on the part of Mr. McAtee that suggests these gifts to the daughter.]   [14]   Suppose a child were to perform these same offices for a parent that were extended by Mr. McAtee to Mrs. Corson, still we do not see how this fact could invalidate the gifts under the circumstances in the case before us.   Under the same pending relationship and surroundings, Mr. McAtee secured a gift of one hundred shares of stock from the daughter.   Although she was weaker mentally than her mother, this gift, after careful consideration, was found to be valid:   Corson's Estate, 137 Pa. 168.   Now, when the same person secures a smaller gift of sixty-six shares of the same stock, not for himself, but for a faithful daughter, we cannot agree that such a gift is void.

" The three and one half shares of Jefferson Fire Insurance stock belonged to the estate of Maria Corson.   The agreement

of January 20, 1886, shows that this stock, while in the name of Mary A. Corson, was in fact the property of Maria Corson. This agreement may be treated as a declaration of trust by Mary A. Corson in favor of her mother. There was nothing subsequent to this agreement that gave Mary A. Corson title to this stock, [and now, May 2, 1892, the exceptions to the master's report so far as they relate to the bonds and railroad stocks are sustained.] [15]

" [ And now, May 6, 1892, this cause came to be heard at this term and was argued by counsel, and thereupon on consideration thereof it is ordered, adjudged and decreed as follows, viz.: That the said 66 shares of preferred stock of the Northern Pacific Railroad Company, and the said registered bonds of the United States for twenty-four hundred dollars, belong to the estate of Mary A. Corson, deceased, and shall be so held and distributed by said defendant, John Q. McAtee, executor of Mary A. Corson, deceased ; that the said defendant transfer to the executrix of Maria Corson, deceased, the said 3½ shares of stock of the Jefferson Fire Insurance Co., and all dividends thereon collected by him ; and that two thirds of the costs of this suit be paid by the estate of Maria Corson, deceased, and one third by the estate of Mary A. Corson, deceased.   The fees of the master are fixed at one hundred and seventy-five dollars.] " [16]

*Errors assigned* were (1–16) portions of opinion as above, and decree, quoting them.

*N. H. Larzelere, Gilbert R. Fox* with him, for appellee, cited : Irwin v. Keen, 3 Wh. 354; Whelan v. Whelan, 3 Cowen, 537· Taylor v. Taylor, 8 How. 183 ; Huguenin v. Baseley, 3 L. C. Eq. 484; Russell's Ap., 75 Pa. 290; Miskey's Ap., 107 Pa. 631 ; Rhoades v. Bate, L. R. 1 Ch. Ap. 252; Darlington's Ap., 86 Pa. 518 ; Greenfield's Est., 14 Pa. 489.

*Charles Hunsicker, Joseph Fornance* with him, for appellee, cited: Eaton's Ap., 66 Pa. 483; Cresson's Ap., 91 Pa. 180 Burke's Ap., 99 Pa. 350; Fidelity Co. v. Weitzel, 31 W. N 414 ; Yeakel's Ap., 137 Pa. 160.

OPINION BY MR. JUSTICE McCOLLUM, October 2, 1893:

It is possible that McAtee is as bad as, in the interest of the appellant, he is represented to be; but that he is a clergyman who enjoys the confidence of his parishioners is not sufficient ground for believing that ·he is. In the mere fact that Maria Corson sought and received his assistance in the transfer of certain stocks and bonds as a gift to her daughter there is nothing indicative of a fraudulent purpose on his part or discreditable to either of them. It is not a necessary inference from such fact that his compliance with the request of the donor was tainted with dishonesty or prompted by selfishness; nor has the fact that he receives a legacy under the will of the donee, made nearly a year after the bonds were transferred, any tendency to invalidate the gift of them. These bonds were assigned by the donor to the donee in the presence of Geo. Eyster, assistant treasurer of the United States at Philadelphia, to whom she stated her reasons for making the gift. The assignment was made at her home, and thereafter the donee regularly drew the interest on the bonds whilst she lived. There is not a scintilla of evidence that the gift was suggested by McAtee or her daughter, or that in making it she was influenced in the slightest degree by either of them. It plainly appears from the testimony that she was prompted to make it by natural affection and a desire to compensate her daughter for faithful and valuable services. It was a just as well as a generous act, and, in view of these services and her own circumstances, it cannot be regarded as improvident or indicative of a want of capacity to comprehend the nature and effect of what she was doing. The suggestion of the learned master that she did not consider that possibly she might survive her daughter is founded on a mere guess, which is sufficiently answered by the fact that, in making her will three months before, she provided for such a contingency. Besides it is not incumbent on a child who receives a gift from a parent to prove affirmatively, in a proceeding to annul the gift, that the donor was told she might outlive the donee, and it would be a harsh rule which allowed the donor to recover the gift from the estate of the deceased child on the ground that her legal representatives failed to make such proof. If there is no evidence which tends to show that the donor was incompetent to make the gift, or which raises a

suspicion of fraud or undue influence on the part of the donee, the capacity of the donor and the fairness of the transaction will be presumed, unless the relation between the parties is such that the policy of the law casts upon the donee the burden of showing that the gift was the voluntary and intelligent act of the donor. In the absence of such evidence this burden does not rest on children who receive gifts from their parents. These gifts are, prima facie, good, and it requires something more than the mere relation of parent and child to nullify them, or to impose on the donee the burden of showing that they are free from any taint of fraud or undue influence : Worrall's Appeal, 110 Pa. 349. It is natural for parents to assist their children, and if they do so by making gifts to them which are, under the circumstances, reasonable, no presumption of incapacity arises. In these cases the natural affection of the donor for the donee and the kind and faithful services rendered by the latter to the former are corroborative of the positive testimony that a gift was made : 8 A. & E. Enc. L., pages 1336-7 ; Rhodes v. Childs, 64 Pa. 18.

In the case under consideration the mother declared her intention to give the bonds to her daughter, to whom, in execution of her expressed purpose, she afterwards assigned and delivered them. The bonds were held by the daughter as her own, with the knowledge and acquiescence of the mother, who, in speaking of the transfer sometime after it was made, said it was just as she wanted it. Another evidence that she understood and was satisfied with what she had done appears in her declarations in the winter and spring of 1886 that she had given her bonds to her daughter.

The gift of the railroad stock was made more than a year after the gift of the bonds, but it was impelled by like considerations, and is governed by the same principles. If the clear and positive testimony in relation to it is believed, and we fail to discover any sufficient reason why it should be disregarded, it, like the former gift, was the voluntary and deliberate act of the donor. This testimony affirmatively shows the voluntary character of her action, and thus substantially negatives the claim that there was fraud or undue influence in it.

The donor was not impoverished by the gifts, because, after making them, she still possessed ample means to provide for

all her wants.   The learned judge of the court below, in his able and exhaustive opinion reversing the learned master, says that her real estate interests alone were worth from $8,000 to $10,000. It is certain that during the life of her daughter she made no complaint or suggestion that she had not retained property enough to afford her a comfortable maintenance.   After the death of the daughter, and under her will, the entire income of her estate, including interest and dividends on the bonds and stock, were paid to the mother while she lived.   It seems therefore that the suit to cancel the gifts did not originate in an apprehension of the donor that her property was insufficient for her support, but that it was instituted to enable her to transfer the bonds and stock to the appellant, who is her sole legatee.

It is probable that the donee could not have influenced the donor in making the gifts if she had attempted to, because it appears in the testimony submitted by the appellant that the latter possessed a stronger mind and will than the former. Margaret Pflieger testified that the donor had a very strong mind and an excellent memory, "a stronger mind than her daughter ever had."   Bridget Calahan said that the donor could influence the donee.   William Pflieger said the donee "was a person that could be influenced by almost anybody." The donor in her deposition taken in July, 1886, said that McAtee could not influence her, but she could not say whether he could influence her daughter or not.   It is true that she was old and physically infirm, but it is equally true we think, after a careful consideration of all the evidence, that she had sufficient capacity to make the gifts and that there was nothing unconscionable in the donee's acceptance of them.   It appears that they were prompted by natural affection and by a just appreciation of the filial devotion and faithful services of the donee, that they were, under the circumstances, reasonable, and that they were intelligently and voluntarily made.   Why then should they be declared void?   Is it because they were made by a mother to her deserving child?   We have already shown that the mere existence of this relation does not invalidate them.   Is it because there is no positive evidence that McAtee told the donor that she might survive the donee and that the gifts were irrevocable.   As we understand the report of the learned master, his recommendation of a decree that the

stocks and bonds be transferred to the estate of the donor rests on an affirmative answer to this question. On this point it is unnecessary to add anything to what has been so well said by the learned judge of the court below. His reasons for holding that the learned master erred in his conclusion that the donor did not know the nature and effect of her action are sensible and sound, and he has clearly and forcibly stated them. That she intended to make a present and absolute gift of the bonds is manifest in what she said before, at the time and after she transferred them ; and that it was her deliberate purpose to make a like gift of the stock is apparent from her declarations from time to time for nearly a year before she assigned it.

McAtee was unquestionably competent to testify for the estate of the donee in the lifetime of the donor, and she was clearly incompetent to testify against it. We are not dealing with the question whether she was a competent witness in her suit against McAtee individually, but our inquiry is whether her testimony so taken is competent in her suit against the estate of her donee.

The specifications of error are overruled.

Decree affirmed and appeal dismissed at the costs of the appellant.