Flagg Estate.

Argued January 16, 1950. Before MAXEY, C. J., DREW, LINN, STERN, STEARNE and JONES, JJ.

*Robert T. McCracken* and *Maurice Bower Saul,* with them *J. H. Ward Hinkson* and *J. Rech Guckes,* for appellants.

*Clarence E. Hall* and *Charles P. Grimes,* with them *Edwin E. Lippincott, 2nd, William Alexander Hamilton, James Conwell Welsh* and *Hall, Hamilton, Wainwright & Welsh,* for appellees.

OPINION BY MR. JUSTICE LINN, May 22, 1950:

The decree set aside redemptions of preferred stock, part of the trust estate, on the ground that the accounting trustees were also in control of the redeeming corpo-

ration and that the existence of this conflict of interest of the trustees, on the one hand, and of themselves, in charge of the corporation, violated the absolute phase of the self-dealing rule and destroyed the effect on the trust estate of the redemption.

Against this contention the appellants, trustees, contend that, in providing distribution of his property, the testator was competent to modify the general effect of the self-dealing rule, that he did so, and that their actions were in accord with his testamentary provisions.

It may be stated at the outset that the uncontradicted evidence is that there is no fraud and that the trustees and the corporation acted in good faith in making the redemptions.

The will is dated June 18, 1930, the codicil December 8, 1933. Testator died [1] March 14, 1934. He left surviving two children, a son, named in the will as S. Griswold Flagg, 3d, and a daughter, Marie W. F. Geyelin. In various paragraphs he refers to the children of his son S. Griswold Flagg, 3d. Testator's daughter, Marie, has two children, Elizabeth Flagg Jennings and Alice Rawle Wagg, both also having children. Apart from his residence and contents, testator's principal asset was his holding in Stanley G. Flagg and Company, Inc., a corporation created by him in 1922 under the law of Pennsylvania. It was engaged in manufacturing fittings and other products for the plumbing trade and represented what may be described as a family business established by the testator's ancestors many years ago and which, when he made his will, was operated in corporate form by testator and his son, S. Griswold Flagg, 3d. The corporation had outstanding 17,137 shares of 6% cumulative preferred stock, par $100, redeemable at 105 and

---

[1] His wife died about a week before his death.

13,000 shares of no par common stock.[2] Testator gave one-half his holding of preferred stock to his son and the Pennsylvania Company in trust to pay the income to his daughter for life and on her death to and among her children and issue of deceased children with power of appointment and in default of appointment to the estates of such beneficiaries according to the intestate laws of Pennsylvania. He gave the remaining half of his preferred stock and all his common stock to his son absolutely.

In the adjudication of the executors' account in 1935 in the court below the court awarded to testator's son and the Pennsylvania Company, as trustees for testator's daughter, (now Mrs. Nugent-Head) the sum of $499,462.10, which included 7495 shares preferred stock carried at the total value of $462,741.30.

In January, 1945, the board of directors of the corporation authorized the redemption and retirement of 1962 shares of preferred stock at $105 per share. The mechanics of the redemption were apparently conducted under the supervision of competent counsel.[3] The trus-

---

[2] At the time of the testator's death the stock in Stanley G. Flagg & Co., Inc. was held as follows:

| Stockholder | Preferred | Percentage of total preferred stock outstanding | Common | Percentage of total common stock outstanding |
|---|---|---|---|---|
| Testator | 14,989 | 87.47% | 7,990 | 61.46% |
| S. Griswold Flagg, 3d | 1,973 | 11.51% | 5,000 | 38.46% |
| Est. of Testator's wife | 175 | 1.02% | 0 | 0. |
| S. Griswold Flagg, 4th | 0 | 0. | 10 | .08% |

[3] The preferred stock was issued subject to certain conditions, one of which was, "All or any part of the Preferred Stock may, by a vote of a majority of the Board of Directors, be redeemed at any dividend period after its issue upon thirty days notice at the price of One hundred and five dollars ($105) per share, together with all dividends accumulated and unpaid thereon. In the event that less than the whole amount of Preferred Stock outstanding is to be redeemed, the shares to be called for redemption shall be determined

tees of the trust for the daughter accordingly surrendered for cancellation 867 shares and received $91,035, for that preferred stock which had been awarded to them at $53,528.58. They invested the proceeds in municipal bonds and reported the transaction to the court below in their first account which was approved, without objection, December 31, 1945, Mrs. Nugent-Head being represented by counsel appearing on her behalf at the audit. This redemption is now stated as a fact in the case though not otherwise involved in our consideration which is confined to the second and third redemptions.

November 12, 1946, a redemption of 2,000 shares was ordered of which 884 shares were held in the daughter's trust. The trustees received the redemption price, $92,-820, for the shares which had been awarded to them at $54,578.16. The proceeds were invested, after providing for taxes, in state, municipal and railroad bonds and the transaction appeared in the trustees' second account filed in December, 1947.

October, 1947, another redemption of 2,000 shares was ordered but on the application of Mrs. Nugent-Head, the court restrained the trustees from surrendering 884 shares for cancellation.[4] Pursuant to citation issued on motion of Mrs. Nugent-Head, the trustees filed the account now before the court.

---

either pro rata or by lot, as may be determined by the Board of Directors and in such manner as they may determine."

[4] This was followed by a stipulation of counsel which need not now be stated. We quote the following statement from appellants' brief. "Giving effect to the third redemption there remain in the trust 4,860 shares of the corporation's preferred stock, aggregating $300,056.40 (at the account value of $61.74 per share, or $510,300 if valued at $105.00 per share). In addition, the trust holds bonds—Government, state, municipal and railroad—including the escrowed securities at a total current valuation of nearly $300,000. This compares with a trust corpus valued at $499,462.10 in 1935, of which 92% of the value consisted of 7,495 shares of the Flagg preferred stock.

At the audit, the guardian ad litem for interested minors and trustee for unborn children and unascertained interests, filed a report supporting the action of the trustees in the redemption [5] transactions.

While the term "self-dealing" sufficiently identifies the rule, it does not define its limitations. The rule is stated in Restatement, Trusts, section 170(1) in the following form: "The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." [6] The appellants agree that there may be conflict of interest between them as trustees of the daughter's trust and as directors of the corporation. Both interests were created by the testator to be enjoyed as limited by his will. The mere existence of the conflict cannot be allowed to destroy the trust because the testator had the power to specify the terms on which he bequeathed his property. For the same reason that the

"In the case of all three redemptions of the preferred stock there was a corresponding reduction in the stated capital of the corporation to the extent of $100 per share, and of surplus in the amount of $5.00 per share, as required by the terms of the corporation's charter. The changes in the capital structure of the corporation were duly reflected by the filing of Statements of Redemption and Cancellation with the Department of State at Harrisburg. In the case of all three calls, the redemption was made on a pro rata basis, as contemplated by the provisions of the charter."

[5] On redemption of preferred stock in this commonwealth, see generally, *Warren v. Queen & Co.*, 240 Pa. 154, 87 A. 595 (1913); *Levin v. Pittsburgh United Corp.*, 330 Pa. 457, 199 A. 332 (1938); *Peoples-Pittsburgh Trust Co. v. Pittsburgh United Corp.*, 338 Pa. 328 12 A. 2d 430 (1940); *Sterling v. H. F. Watson Co.*, 241 Pa. 105, 88 A. 297 (1913).

[6] See generally, *Pomeroy v. Bushong*, 317 Pa. 459, 177 A. 10 (1935); *Tracy v. Central Trust Co.*, 327 Pa. 77, 192 A. 869 (1931); *Lewis Estate*, 349 Pa. 455, 37 A. 2d 559 (1944); *Downing Estate*, 162 Pa. Superior Ct. 354, 57 A. 2d 710 (1948), aff'd 359 Pa. 534, 59 A. 2d 903 (1948). See also *Drueding v. Tradesmens Nat. Bk. & Tr. Co.*, 319 Pa. 144, 179 A. 229 (1935); *Saeger Estates*, 340 Pa. 73, 16 A. 2d 19 (1940); *Mallon's Estate*, 345 Pa. 115, 27 A. 2d 41 (1942).

possible operation of the conflict cannot be allowed to destroy the trust, it cannot be allowed to cut down the effect of the absolute bequests, because, again, the testator had the power to make the bequests. The testator, having the power to do so, created the conflict which became a fact or condition in the administration and devolution of his property to be observed by his executors and trustees. This administration is subject to the scrutiny of the courts, who restrain or otherwise pass on charges of breach of trust.

It is at this point in our review, that the error of the learned court below stands out. The record shows no fraud on the part of the trustees; they acted in good faith; the challenged action is within the provisions of the will. Why then, on the life tenant's exception, did the learned judge set aside the redemption of the preferred stock shown in the second account? He leaves no doubt on the subject: he states that, "In voting for redemption, Mr. Flagg was duty bound to serve the best interests of the trust, and was also duty bound to serve the best interests of the corporation. He could not do both at once. It is unnecessary to decide which interest he did in fact serve; *the existence of the conflict of interests ipso facto disqualified him* from acting. . . . Again, it is unnecessary to determine whether he was in fact influenced even to the slightest degree by any selfish motive in voting for redemption; *it is the conflict of interests rather than bad faith* which is the determinative factor. It seems obvious that Mr. Flagg's duty of loyalty to the trust was not undivided. . . . This court is bound to conclude, therefore, that when the trustees voted for the redemption of the preferred stock, and then surrendered the stock pursuant to such call for redemption, they were unable to consider solely the best interests of the trust. Consequently, the transaction cannot receive judicial approval." (italics supplied). The learned judge apparently thought that opportunity to do wrong was,

under this will, the equivalent of doing wrong. His conclusion that "the existence of the conflict of interest ipso facto disqualified him from acting" and that "the conflict of interests rather than bad faith . . . is the determinative factor," cannot be allowed to set aside the intention of the testator manifested in his will.

The will shows that the testator had the conflict in mind when he made it and left it to be one of the conditions of his testamentary dispositions to be dealt with during administration. He knew the preferred stock was issued subject to redemption (he had the business, theretofore conducted as a partnership composed of himself and his son, incorporated in 1922) and he knew that by his bequest he was giving unrestricted voting powers in the corporation to his son who had been his partner. In the twelfth paragraph of the will he authorized his son to buy all the preferred stock at the redemption price. The conferred right to exercise all these plenary powers of ownership necessarily modified or displaced the otherwise absolute limitation against self-dealing. This record shows that the conflict of interest did not disqualify the trustees; it shows that they acted in good faith in what they, acting as reasonable men [7] thought was for the best interest of the trust. If they had acted prejudicially the court would have had something to go on.

The clear cut issue so presented for our consideration makes it unnecessary to recite at length the details whereby S. Griswold Flagg, 3rd. executed various trusts of common stock for the benefit of his children, appointing himself and the Pennsylvania Company trustees. These trusts, the life tenants contend, increased the conflict of interest, but, as we have said, the test in such cases is not in the quantum of possibly conflicting interest, but in the administration which is always subject to the scrutiny of the orphans' court. Neither need we

---

[7] See 2 Scott on Trusts, 170.25.

enlarge on the position of the Pennsylvania Company as testamentary trustee, though, on the question of redemption, it may be noted that soon after the testator's death, Mr. Sayre, Vice President in charge of trusts, a member of the board of the Flagg company, concluded the trust investment in the preferred stock was too large for prudent investment and began his efforts, ultimately successful, to have it reduced. And there was reason for this as the facts were presented at that time. When testator died in 1934, the dividend on the preferred stock had not been earned and was in arrear $10.50 per share; by 1940 this arrearage had increased to $25.60. It is well known that the incomes of metal working industries such as the Flagg company picked up and increased rapidly and largely with the approach of the war, wiping out red accumulations and changing the balances into black. In the ten year period from 1931 to 1940, the company's average net profits were $47,181.00 per year against preferred stock dividend requirements approximating $102,-000 per year; only in 1940 did the corporation earn its annual preferred dividend requirements. During the war years 85% of the company's business was with the United States government.

There is neither suggestion nor basis for one, that the Pennsylvania Company had any selfish interest to be served by joining in the redemption proceeding. Another vice president, described as the "chief investment officer" of the Pennsylvania Company testified, "It was a thoroughly and is a thoroughly unsatisfactory investment for a trust fund. If you desire I can go further. The Company is a small company in its industry, the industry is highly competitive, it is the prince-pauper type of industry; in other words a lot of money can be made in good years and very little in bad years. The stock has no market whatever and the amount of the stock which was originally $1,700,000. is now $1,300,000. or $1,000,-000. is too large—depending on others is too large for

the size of it. In other words annual dividends are too big a burden for this Company to carry. It is much better $1,000,000 than $1,700,000."

The real objection of the life tenants appears to be that the change in investment may result in a reduction of income; but that is not the final test. In Brown's Estate, 287 Pa. 499, 502, 135 A. 112 (1926), we said, "In considering the sale of investments that have no open market, or bonds in a depressed market, or stock whose intrinsic value is established, paying dividends equal to and above what would be a normal interest rate, reasonable latitude, according to the circumstances, must be allowed a fiduciary in the disposition of such property.

"Investments in stocks, or bonds are a means by which money is made to earn for itself money or income. The primary thought in both should be property value, then income. Occasionally the investor considers the latter paramount, depending largely on individual necessities, *but the first essential thing for a fiduciary to consider is the safety of the principal even though it may sacrifice income.*" (italics supplied)

Our cases illustrate the application of the rule and the consequent enforcement of testator's intention, notwithstanding the self-dealing restriction.[8] In referring to these cases the appellees dismiss them, in the words of their brief, as "no more than a recognition of the familiar rule that valid contracts entered into by a testator before his death will be carried out after his death, or that an express power of self-dealing granted by will may be exercised validly, provided it be exercised in strict accordance with the terms of the will." There is no

---

[8] *Wallace's Estate*, 299 Pa. 333, 149 A. 473 (1930) ; *Rosenthal's Estate*, 335 Pa. 49, 6 A. 2d 585 (1939). See also *Liebert Estate*, 62 D. & C. 90 (O. C. Phila., 1948), and *Enslen, Jr.'s Administrator v. Enslen*, 178 Ky. 610, 199 S. W. 794 (1918). Cases on trusts inter vivos also illustrate the point: compare *Edson v. Norristown-Penn Trust Co.*, 359 Pa. 386, 59 A. 2d 82 (1948).

proper distinction between express and implied power; where the power, indeed duty, to engage in self-dealing is necessarily implied in the terms of the testator's will the valid exercise of that power will not be set aside by this court. We do not wish to impair the value of the rule against self dealing when properly applied. Testamentary provisions must be given effect notwithstanding the existence of the self-dealing rule; it is not the abstract conflict but the administration that is decisive and administration is subject to the control of the court. Failure to apply that principle requires the dismissal of the exceptions.

The Orphans' Court Act [Act of June 7, 1917, P. L. 363, section 22(b)] 20 PS 2602, provides: "The Supreme and Superior Courts of this Commonwealth shall, in all cases of appeal from the definitive sentence or decree of the orphans' court, hear, try and determine the same as to right and justice may belong, and decree according to the equity thereof; . . ." See *Pollock's Estate,* 306 Pa. 301, 312, 159 A. 555 (1932); *Fenelli's Estate,* 323 Pa. 49, 52, 185 A. 758 (1936); *Knecht's Estate,* 341 Pa. 292, 298-9, 19 A. 2d 111 (1941); *Shelly Estate,* 154 Pa. Superior Ct. 433, 437, 36 A. 2d 197 (1943).

The decree is reversed; the record is remitted for the entry of an appropriate decree not inconsistent with this opinion, costs shall be paid out of income.