## Hofkin Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*Cohen, Shapiro, Berger & Cohen,* for Abraham L. Shapiro.

*I. I. Jamison, Edward Greer,* and *Folz, Bard, Kamsler, Goodis & Greenfield,* for settlor and beneficiaries.

*James M. Marsh,* guardian ad litem.

### ADJUDICATION

BOLGER, J., November 5, 1965.—These trusts arose under three irrevocable deeds of trust dated December 24, 1959, whereby Milton L. Hofkin conveyed to himself and to Abraham L. Shapiro as cotrustees 300 shares of class B nonvoting stock of Penn Galvanizing Co., Inc., to each trust in trust upon terms and conditions more fully set forth hereinafter.

The provisions and terms of the trusts are identical. Income from each trust is to be paid to the designated beneficiary of each for a term of years expiring February 1, 1970, or until the death of any beneficiary prior to that date. Upon termination, principal shall be paid to the settlor, if living, otherwise to his estate.

The beneficiaries of the separate trusts are Joan Hofkin, wife of the settlor, Michael Hofkin, his son, and Susan Hofkin, his daughter, who is a minor.

The accounts separately stated from December 24, 1959, to August 1, 1962, have been filed by Abraham L. Shapiro, one of the trustees. Subsequently, and at the direction of the auditing judge, supplements to each account were filed by Milton L. Hofkin alone covering the period from July 10, 1962, to June 1, 1965. The original accounts were filed by Mr. Shapiro because he desires to resign as cotrustee.

Exceptions were taken by the settlor to each account requesting that a credit of $1,333.34, paid to Shapiro on January 31, 1962, should be stricken from the accounts. Settlor also objected to a further claim pre-

sented at the audit by Shapiro for additional commissions.

By decree dated December 29, 1964, James M. Marsh, Esq., was appointed guardian ad litem for Susan Hofkin, a minor. His report is annexed.

The facts which have been established and are generally admitted may be briefly summarized as follows:

Penn Galvanizing Co., Inc., was a closely held family corporation. All of the stock, which consisted of 800 shares of class A common voting stock and 6,400 shares of class B nonvoting stock, were held equally by the settlor, Harry H. Hofkin, his brother, and Pauline Hofkin Greenberg and Rose Hofkin Merves, his sisters.

On the same date when the present deeds of trust were executed, all of the stockholders entered into an agreement restricting the transfer of the stock to each other, their spouses and children or to trusts for the benefit of the same class. This agreement provided, inter alia, that if a majority of the stockholders owning the voting stock agreed to sell the same for the purpose of transferring control of the corporation outside of the Hofkin family, the remaining stockholders were bound and obliged to transfer their stock for the same price received by the majority.

The guardian ad litem states that the purpose of the trusts known as "short term trusts" was to avoid, but not evade, Federal income tax. A study of the deeds confirms this fact. There is no specific reference in the deeds to the restrictive agreement, but it is not contended by anyone that the shares of stock which represent the res of the trust were not subject to the terms of the agreement.

In the spring of 1961, negotiations were started for the sale of all of the stock of Penn Galvanizing. These negotiations were terminated on December 21, 1961, and a total purchase price of $3,600,000 was offered

and accepted. Shapiro was to receive as commission $100,000 out of the purchase price for his services in negotiating the sale, leaving a net sale price of $3,500,-000. Harry and Milton Hofkin were to receive employment contracts from the buyers.

Each of the stockholders signed a written agreement confirming the commissions of $100,000 to be paid to Shapiro pro rata, as and when payments of the purchase price were received by the sellers.

The initial payment was made in accordance with the terms of the agreement of sale, and all of the stockholders paid their first installment on account of the $100,000. The share of that commission paid out of the principal of each of the present trusts is the disputed $1,333.34, paid January 31, 1962 with checks signed by Shapiro and Milton L. Hofkin, his cotrustee.

On June 4, 1962, Shapiro tendered his resignation as cotrustee of the three trusts.

On July 3, 1962, Milton and Harry Hofkin were dismissed as employes of the corporation which had purchased the Penn Galvanizing stock. The dismissals were found to be for good cause by a board of arbitration, which had been called in accordance with the terms of the employment contract.

The purchaser of Penn Galvanizing stock was a syndicate organized in the law offices of Cohen, Berger, Shapiro, and Cohen, of which firm Abraham L. Shapiro was and is a partner. Involved in the transaction was the purchase of the stock of Esslinger, Inc., a brewing company which had been in existence for many years. A new corporation called Esslinger Industries, Inc., was created and all of the stock of Esslinger, Inc., was transferred to the new corporation. The titular purchaser of Penn Galvanizing Co., Inc., stock was another new corporation called P. G. Metals, Inc. All of the stock of P. G. Metals, Inc., was owned by one entity; viz., Esslinger Industries, Inc.

The disputed facts which have occasioned this controversy may be stated briefly as follows:

Milton L. Hofkin states that at all times during the negotiations and the consummation of the sale of Penn Galvanizing, he did not know that Shapiro's law firm and Shapiro individually had any proprietary interest in the syndicate which ultimately bought Penn Galvanizing. He contends that he did not learn of this fact until after the initial payments on account had been received and made. He further contends that throughout the entire negotiations, he considered Shapiro as his personal attorney, and was guided by his advice.

Hofkin makes no complaint concerning the adequacy of the purchase price of $3,600,000, nor of the reasonableness of the fee of $100,000.

Shapiro contends that at the outset of negotiations, he informed Hofkin that the syndicate was being formed within his law firm; that he individually had a small proprietary interest in the syndicate, and that from the inception of the negotiations he was acting solely on behalf of the purchasers.

Very extensive hearings were held, at which, inter alia, Nathan Silverstein, Esq., testified that at the request of Harry Hofkin, he attended various meetings, at some of which Barton E. Ferst, Esq., representing Rose Merves, a sister of the Hofkins, was present. Milton and Harry Hofkin were also present at several of these meetings, and it was clear to the witness that Shapiro at all times was acting on behalf of the purchasers. These meetings had nothing to do with the purchase price, but did involve the drafting, revising and approval of various documents, including the employment contracts, all of which were necessary to complete the transaction. The witness stated that he was acting as attorney for all the Hofkin stockholders.

Barton E. Ferst, Esq., acknowledged that he knew Shapiro was representing the buyers. He also knew

that Shapiro had some proprietary interest in the stock of the purchaser on or about December 22, 1961.

Neither Mr. Silverstein nor Mr. Ferst was expressly engaged by Milton L. Hofkin to act as his counsel. They acted in unison for the collective benefit of all of the Hofkins.

The trusts with which we are concerned are sophisticated instruments, and all of the parties involved are worldly-wise persons. It may very well be, as the guardian ad litem notes, that these trusts were established in order to reduce the income tax burden of the settlor. He is the sole owner of the vested remainders. Principal must come to him or his estate at termination of the trust. In the meanwhile, and until termination, he must accept the self-imposing obligation of dealing with the corpus of each as a fiduciary, and must at all times act for the best interests of each beneficiary. All income must be paid to, applied for or accumulated as the sole property of each beneficiary.

Abraham L. Shapiro accepted the obligations of a fiduciary relationship which imposed the clear and absolute duty to act for the best interests of all beneficiaries. He could make no personal profit in the administration of the trust res without first obtaining the consent of a competent court or the consent of all of the parties to whom he owed a duty of unswerving loyalty: Flagg Estate, 365 Pa. 82 (1950); Schulz Estate, 374 Pa. 459 (1953); Reichert Estate, 56 D. & C. 1 (1946). His effort to resign after the dispute arose was too late to exculpate himself from the burdens of his trusteeship.

The auditing judge finds that Milton's claim that he relied solely upon Shapiro's advice as his attorney is unbelievable. The auditing judge also finds that Milton's purported ignorance of the involvement of both Shapiro's law firm and his individual proprietary interest in the syndicate is incredible.

The exact extent of Shapiro's interest and proof of any profits that accrued to his benefit as a member of the syndicate have not been established in this record.

The auditing judge finds that the beneficiaries of these trusts were never consulted directly by Shapiro. They were not informed by him of his true position in the negotiations, nor of the extent of his fee. The record discloses that he did not apply to the court for approval prior to December 29, 1961.

The trust agreements are silent concerning compensation to the cotrustees. The accounts as filed and supplemented do not show any claim for commissions which are ordinarily paid as compensation to trustees. Shapiro has stated of record that he does not propose to make any claim excepting for the pro rata share of his $100,000 fee.

The auditing judge finds that his attempted resignation as trustee was and will continue to be ineffective until these accounts have been confirmed absolutely. Had he followed the procedure outlined in Nixon's Estate, 235 Pa. 27 (1912), before the negotiations for the sale had been completed, he would not be in the position in which he finds himself today. It is no excuse that the restrictive agreements entered into by the stockholders bound him. He was the moving party in the sale of Penn Galvanizing. This created a patent conflict of interest. He must accept the consequence.

He cannot now claim his commission to the detriment of the beneficiaries, who will be deprived pro tanto of the interest or profits to the extent that the res is diminished by payment of pro rata shares of the $100,000.

Milton also had a personal axe to grind for his individual benefit. The 1,200 shares of stock comprising the principal of these three trusts were only a part of his entire holdings. He insisted upon and did receive a personal employment contract from the buyers.

The auditing judge finds that he dealt at arm's length with Shapiro as the admitted agent for the buyers. He did so for his own benefit, and when as cotrustee he agreed to payment of a part of the $100,000 fee, there arose a conflict of interest between his duty to the income beneficiaries of the trust and his own personal gain. The auditing judge finds that Milton L. Hofkin, as remainderman, has by his written agreement bound himself to pay to Abraham L. Shapiro the pro rata shares of his fee represented by the corpus of each trust. Payment shall become due and payable immediately upon the termination of any or all of the trusts, or, if they continue, to the fixed termination date of February 1, 1970.

The auditing judge surcharges the trustees in each estate $1,333.34. He refuses the additional claims by Shapiro for pro rata payments for and during the term of each trust.

The supplemental accounts show that payments have regularly been received since the first due date in January 1962. Investments were made in April of 1963, and since that date to the present time, $40,000 has been received in each trust, and no investments of these payments from P. G. Metals Co. have been made. This is supine negligence, and indicates a wanton disregard of the interests of the beneficiaries' right to receive income, and is in contravention of the direction in each deed to invest and reinvest principal. As early as Breneman v. Frank, 4 Pa. 475 (1857), citing Findley v. Smith, 7 S. & R. 268, page 479, the court held: "He [the trustee] had no right to 'hide the money in the earth' or 'keep it laid up in a napkin'. The trustee in ancient times who hid the trust money in the earth was condemned as 'wicked and slothful . . .' ". The trustees must be surcharged because of their failure to invest principal while this litigation has been pending. The auditing judge finds that the

surcharge is at the rate of four percent per annum on principal from the date the same was received as payments on account of the purchase price of the stock. The amount of such surcharge shall be calculated and shown in the schedules of distribution to be filed hereunder.

The deeds of trust uniformly provide that upon the failure of Abraham L. Shapiro to continue to act as trustee, Philip M. Shiekman shall act as cotrustee in his place and stead. Mr. Shiekman has expressed a willingness to act as trustee. The settlor, the income beneficiaries and the guardian ad litem have all objected to his becoming substituted cotrustee, because he continues to be a member of the firm with which Shapiro is associated and, therefore, the conflict of interests which has existed may very well continue.

Milton L. Hofkin, in accordance with the provisions of the deeds, has designated I. I. Jamison substituted cotrustee, and Mr. Jamison has accepted. . . .

AND NOW, November 5, 1965, the accounts are confirmed nisi.

OPINION SUR EXCEPTIONS TO ADJUDICATION
OF BOLGER, J.

BURKE, J., January 21, 1966.—The principal issue raised by the exceptions relates to the findings of fact made by the auditing judge that the allegation of Milton Hofkin, the settlor-cotrustee, maintaining that he relied solely upon the advice of Abraham L. Shapiro, as his attorney, in the transaction involving the sale of his family business, is unbelievable, and that his purported ignorance of the involvement of both Shapiro's law firm and his individual proprietary interest in the syndicate which purchased the business is incredible.

The law is settled beyond question that the findings of fact by an auditing judge, like the verdict of a jury,

will not be disturbed unless clear error be shown. The credibility of witnesses and the weight to be given to their testimony can be much better determined by the judge before whom they appeared, who had the opportunity to study their demeanor while on the witness stand. See Collings Estate, 405 Pa. 280 (1961); Pavlinko Estate, 399 Pa. 536 (1960); Hanna Estate, 383 Pa. 196, 199 (1955); Blecher Estate, 381 Pa. 138, 143 (1955); Harbison Estate, 365 Pa. 468, 473 (1950). In the present case, our study of the record leads us to the conclusion that not only was there no error in the auditing judge's findings, but that they were the only reasonable findings that could have been made under the circumstances of this case.

We agree with what the auditing judge has so well said in the adjudication, that the trusts with which we are concerned are sophisticated instruments, and all of the sui juris parties involved are worldly-wise persons. For, all practical purposes, Milton L. Hokfin was the owner of the shares of stock of the Penn Galvanizing Company, Inc., which he placed in the trusts. True, in an effort to reduce his tax burden, he carved out an interest in each of the three trusts, giving his wife, in one case, and his children, in the other two cases, the income for a period of 10 years. However, he was the owner of the trust res when the trusts were created, and it will revert to him, or to his estate, when the 10-year period for which the trust was created expires on February 1, 1970. Hofkin agreed to the payment of the commission to Mr. Shapiro, and he is bound by his agreement. Under the auditing judge's disposition of the case, no part of Mr. Shapiro's commission will be borne by the income beneficiaries who were not parties to the agreement. This, we think, was a wise and proper decision, with which we fully concur.

The argument before the court en banc that the orphans' court is without jurisdiction to pass upon the

merits of Mr. Shapiro's claim for his services in arranging for the sale of an asset of the trust estate is groundless. The audit of the trustee's account in the orphans' court is the time and the place to present such claims.

The auditing judge surcharged the accountants for failure to invest the funds received by them as trustees. It now appears, from statements made by counsel at the argument, that all such receipts were deposited in a savings account in the Philadelphia National Bank. Therefore, Mr. Shapiro's exception to the imposition of this surcharge is sustained, with the consent of the auditing judge, and the adjudication is modified accordingly.

The other exceptions are all dismissed, and the adjudication, as herein modified, is confirmed absolutely.